## S03A0092. POWELL v. THE STATE.
### (581 SE2d 13)

HINES, Justice.

Keith Watson Powell appeals his convictions for malice murder and possession of a firearm during the commission of a felony in connection with the fatal shooting of his elderly father, George Watson Powell. He contends that his trial counsel was ineffective by failing to interview witnesses and by otherwise failing to properly prepare for trial. Finding Powell's claims of ineffective assistance of trial counsel to be without merit, we affirm his convictions.[1]

Construed in favor of the verdicts, the evidence showed that on May 22, 1998, Keith Powell, who was 44 years old and had been living with his parents for the past five years, was at home and, as was his custom, carrying a .45 caliber handgun in a holster at his hip.

---

[11] OCGA § 46-2-71 (a).

[1] The crimes occurred on May 22, 1998. On July 16, 1998, a Newton County grand jury indicted Powell for (1) malice murder; (2) felony murder while in the commission of aggravated assault; (3) possession of a firearm during the commission of a felony, to wit: murder; and (4) possession of a firearm during the commission of a felony, to wit: felony murder. He was tried before a jury March 8-11, 1999, and was found guilty of malice murder and both counts of possession of a firearm during the commission of a felony; the jury did not return a verdict on the felony murder charge or on voluntary manslaughter as a lesser included offense. On March 15, 1999, Powell was sentenced to life imprisonment for the malice murder and five consecutive years in prison for possession of a firearm during the commission of a felony, to wit: murder; he was not sentenced on the remaining firearm possession charge. Trial counsel filed a motion for new trial on behalf of Powell on March 29, 1999, and new counsel filed an amended motion for new trial on behalf of Powell on December 6, 2001. Both motions were denied on February 19, 2002. A notice of appeal was filed on March 25, 2002; Powell filed a "Defendant's Dismissal of Notice of Appeal Without Prejudice" on April 10, 2002. Powell was granted an out-of-time appeal on August 5, 2002, and Powell filed a notice of appeal on August 13, 2002. The appeal was docketed in this Court on September 20, 2002. The case was submitted for decision on November 11, 2002.

Powell's parents were afraid to confront him about carrying the pistol around the house.

That evening, Powell's mother, Betty Powell, returned home and was looking for the television remote control. Powell, as he had a habit of doing, hid the remote control from his mother. When she asked for it, he refused to give it to her. Powell's father, George Watson Powell ("Watson"), witnessed the incident and told Powell to give the remote control to his mother, but Powell again refused and went from the den to the kitchen. Despite Betty's urging that he drop the matter, Watson followed Powell into the kitchen and again asked that the remote control be given to Betty. Powell responded that he would do so when his father "quit treating [him] like a three-year-old." At that, the 72-year-old Watson grabbed his son by the shirt and began twisting it. Powell jumped out of the chair, pushed it away, and went over to the windows behind the table; Watson and Betty stepped back. Standing about eight and one-half to nine feet away from Watson, Powell pulled out his pistol and shot his father in the stomach. Watson was unarmed and never struck Powell or even drew back his fist. Betty called 911, but Watson died of his wound. When the police arrived at the home, Powell was waiting for them with a toothbrush and a Bible. He admitted shooting his father, and the police retrieved the murder weapon from a kitchen cabinet.

At trial, Powell claimed that the shooting was in self-defense. He testified that he feared his father, due to abuse as a child and an incident about ten years earlier when his father had allegedly hit him in the head at work and taken his pistol. However, Powell also admitted that, despite this alleged violence, he had moved back in with his parents about five years prior to the killing, his parents had supported him for the last three years, and he had gotten along well with his father at work. Powell maintained that he carried the pistol because of fear of his father's violence and threats he had received from others; he related incidents where he had been beaten, drugged, and threatened supposedly because of gold he had discovered.

Powell's brother testified that all the children had been physically disciplined but refuted claims that Powell had been abused as a child. Powell's mother testified that she did not believe that Powell was afraid of his father or her. Powell's aunt and uncle both testified as to Watson's peaceful nature. Powell's good friend, Murray, with whom Powell lived for about two years, testified to the positive relationship between Powell and his father and that Powell never mentioned any abuse by his father. Murray further testified that Powell had a lot of anger toward his mother, accusing her of abusing him in a ritualistic satanic manner.

Dr. Theresa Sapp, the forensic psychologist called by the defense, testified that Powell was mentally ill with a delusional disorder, but

knew right from wrong and that shooting his father was wrong. Dr. Sapp further testified that Powell's delusion did not seem to play a role in the shooting, and that x-rays failed to show any evidence of the brutal abuse Powell claimed to have endured at the hands of his father and others.

1. The evidence was sufficient to enable a rational trier of fact to find Powell guilty beyond a reasonable doubt of the malice murder of his father and of possession of a firearm during the commission of the murder. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. At trial, Powell was represented by court-appointed counsel. Following trial, Powell was appointed new counsel, who brought a motion for a new trial, claiming ineffective assistance of trial counsel. After hearings in the matter, the trial court ruled that appellate counsel was unable to show how trial counsel's alleged ineffectiveness prejudiced Powell's defense at trial or denied him a fair trial.

Powell now contends that his trial counsel provided ineffective assistance by failing to interview certain witnesses and otherwise adequately prepare for trial, including meeting with him alone only once during the time he was in the county jail; not discussing the theory of the case or trial strategy with him; not going over the State's witness list with him; and not introducing evidence as to his father's character and specific instances of violence inflicted on him by his father.

> In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the client that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. [Cit.] The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct. . . .

*Boyd v. State,* 275 Ga. 772, 774 (3) (573 SE2d 52) (2002), quoting *Hamilton v. State,* 274 Ga. 582, 587-588 (13) (555 SE2d 701) (2001). On appeal, this Court will "accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." *Suggs v. State,* 272 Ga. 85, 88 (4) (526 SE2d 347) (2000).

The evidence showed that at the time of Powell's trial, his counsel had been a member of the bar in good standing for about nine years and had tried more than twenty felony cases. Trial counsel met with Powell soon after his appointment, at least twice at the jail prior

to trial and several more times when Powell was in court for pre-trial proceedings; he talked with Powell about the circumstances of the shooting and his relationship with his father, and was sure, in preparing for trial, that he had discussed with Powell the theory of self-defense; counsel sent Powell a copy of the discovery materials received from the State; counsel had concerns about Powell's mental state and requested a psychological evaluation to support the theory of justification; he talked with the examining psychologist, and after further reviewing Powell's situation, requested a more in-depth psychological evaluation; and counsel interviewed Powell's mother and other family members a number of times. In addition, counsel talked with Powell specifically about witnesses that might be important to his defense, but Powell failed to supply him with enough information to locate the witnesses for interviews, much less subpoena them for trial. Powell never indicated to trial counsel that he was not prepared to go to trial and counsel believed that he was ready to defend the case.

Powell points to a statement by trial counsel at a motion in limine hearing, to the effect that he anticipated the evidence to show only past verbal confrontations between Powell and his father, as demonstrating a lack of preparation inasmuch as the testimony of witnesses at trial included accounts of past physical altercations and abuse. But counsel's comment fails to show that he was unprepared for trial.

The defense attempted to offer evidence of the father's alleged propensity for violence and past acts of violence. Powell testified to physical discipline when he was a child and to one alleged incident as an adult when his father hit him in the head with an object. But there was no evidence of such incident other than Powell's bare assertion. Further, Dr. Sapp testified to Powell's delusional disorder, his stories of past violence, and his fear of his father.

At the initial hearing on his motion for a new trial, Powell claimed that there were other witnesses who could corroborate his allegations, but he did not call any. The trial court granted Powell a thirty-day recess to allow him more time to locate his claimed witnesses, but at the second hearing which took place approximately two months later, the only additional witness Powell called, besides himself, was his mother, Betty, who had been a witness for the State at the trial. Appellate counsel stated at the hearing that the witnesses offered by Powell simply did not back up Powell's story.

Powell also cites in support of trial counsel's alleged lack of preparation, Betty's testimony at the second motion for new trial hearing that she observed confrontations between Powell and his father during Powell's childhood, including physical discipline which she considered "overbearing"; she did not recall any physical altercations

between Powell and his father after Powell became an adult. However, although Betty confirmed that she had spoken with trial counsel on more than one occasion, she was unsure as to whether she had told him about the childhood incidents between Powell and his father.

Under the evidence, Powell failed to carry his burden of showing that his trial counsel's handling of his case was outside the bounds of reasonable professional conduct. *Boyd v. State,* supra at 774 (3); *Hamilton v. State,* supra at 587-588 (13). Accordingly, the trial court properly rejected his claims of ineffective assistance of trial counsel.

*Judgments affirmed. All the Justices concur.*

DECIDED MAY 19, 2003.

*Reed Edmondson, Jr.,* for appellant.

*W. Kendall Wynne, Jr., District Attorney, Thurbert E. Baker, Attorney General, Jennifer S. Gill, Assistant Attorney General,* for appellee.